It pleases the court, Michael Caruso on behalf of Lourdes Margarita Garcia. Your Honor, the parties come to court today with an agreement that the district court violated Ms. Garcia's Fifth and Sixth Amendment rights during the course of her trial. As this court knows, the district court on the sixth day of trial resumed after a lunch break the direct examination of the case agent without Ms. Garcia or her lawyer present. Ms. Garcia's lawyer missed approximately three minutes. Ms. Garcia herself missed about five to ten minutes. Because of these constitutional violations alone, but certainly in combination with the concedes, we believe that Ms. Garcia deserves a new trial. On the Sixth Amendment issue, we've been down this road before in the United States versus Roy. I'm familiar. What what distinguishes this case from Roy? So I think two matters, one factual and one legal. Factually, in Roy, the defendant was always present. Mr. Roy was at counsel table during the trial. Here we have a completely... Of course, that cuts both ways, seems to me. In a sense, leaving a defendant all alone without a lawyer almost looks as if the defendant's lawyer has abandoned him. So, but I agree, it's certainly different. I believe it's different and it's a more serious problem, Your Honor, because of the to the jury about resuming a trial with an empty defense table. As pointed out in the briefs, at the end of the first day of trial, the judge instructed the jury that trial could not commence without everyone being present. The judge, the jury, and the parties. Yet on the sixth day of trial, he violated his own order and resumed the trial with an empty defense table. So we think, we think obviously Roy was a serious matter and it did communicate that message that his lawyer had abandoned him. Here we have a more serious problem because the communication is that the judge thought the defense so unimportant and so unnecessary that he could start the trial without it, without them. Well, we I mean it's the same, same courtroom. Same courtroom, same judge. Yes, but now we have a different factual matter with a completely empty table and we've all practiced in district court. We know the jury sees everything. So, so that's the one thing that makes this case different from Roy is that Mrs. Garcia was not present. That's correct. There's a, there's a, there's a completely empty table. Is there anything else? No, your honor. Well, I would have thought that it would be significant that in Roy the offending questions that were inculpatory and elicited in the absence of counsel were reprised. Prosecutor asked the same questions again in more detail, so there was no question that the counsel for the defendant was in a position to respond, to object, and maybe more importantly to fashion how he would come at cross-examination, whereas in this case nothing was reprised. The six pages are just empty. I mean isn't that an important difference? I believe so. As the government points out in, in its brief, there, there had been some overlap in testimony throughout the trial, but certainly it different, our case is different from Roy in that the prosecutor again did not go over all the questions he had asked while Mrs. Garcia and her lawyer were not there when they both returned. Now what significance are we to attach from the fact that in this case, unlike in Roy, we know what happened. In Roy we had basically a blank record about the district court going forward. Did he know or didn't he know about the absence of counsel? Nothing was flagged, nothing was said. In this case we know because counsel does come in during the back end of the cross, the defendant comes in still later, and the issue is flagged in two ways for the judge, right? So we know the problem we had in Roy was we had a blank record about what may have transpired. We don't have that here. Right, and I, and I would, it seems to me, and I want you to help me with it, it makes it more difficult to argue that harmless error ought to apply rather than plain error. On the other hand, you might argue that the violation is all the more egregious. I'm gonna argue both those things, Your Honor. So we think, yes, the record is more developed in this case based on just the proceedings that took place on the Friday and the subsequent sidebar on Monday. I would tweak your this issue did not need to be flagged for the judge because as the government has stipulated, the judge knew full well that he was starting without them. So we think, so let me just be sure I understand that. Am I correct that there was a stipulation that at the outset of the inquiry, in the absence of counsel and the defendant, the prosecutor motioned with his hand to an empty defense table? Is that a stipulation? Just help me with that. I saw that somewhere in the record. There's a stipulation contained in the government's brief that the AUSA motioned to the judge either by hand or by eye contact that the defense table was was empty. The judge then responded, please continue. But the record doesn't, the transcript is silent on that, right? The if we fast forward to the filing the following trial day when the parties went sidebar to discuss the issue, you can tell from the exchange that the district judge was not surprised that this issue was being brought to his attention. He made a very quick finding of fact that he started the trial without them because they weren't there. I think we would have a different case on the record if the judge had indicated surprise and said he wasn't aware of this issue. Let me ask you a threshold question. How are we supposed to review this? It seems to me there are theoretically only three possible ways we can review it. Either for structural error, but I think we've answered that question in Roy. For harmless error, where the government has the burden of showing that it was harmless beyond a reasonable doubt. The problem that I have is that unlike that case, the defendant could have objected, was asked if he had a position, said he had no objection on the record. So I don't think he's preserved harmless error, in which case the third possibility is plain error review. Is that not the prism through which we should look at this case? So I think the court should not consider these errors under the plain error doctrine based on the case of Wood v. Georgia that basically said if three conditions are present, plain error is not appropriate. And those three conditions were that the error implicated the lawyer's own conduct, which it did the lawyer herself was late to court. The government was aware of the stipulation, and the record is full so that the district court knew about the error. Again, we essentially have a stipulation that the district court knew that he started the trial without them. So we believe under Wood v. Georgia, you don't have to go to plain error, you can go right to harmless error. So your view is we ought to review it for harmless error? Yes, with it with a caveat that I think that this error is either structural or a hybrid error under Brecht, which relieves the court of the obligation to find harmlessness. Let's talk about structural error. The problem, just speaking for myself, that I think you have with that is essentially that question was resolved in Roy. That is to say, it was a short absence in a lengthy trial. It was like one-half of one percent of the totality of the was and maybe it was error. Maybe it had an impact, maybe it didn't. It wasn't structural because it didn't infect the totality of the of the process. And I'm hard-pressed to see how we could say apply structural error here, when in Bonk we did not apply structural error there. It doesn't mean you lose, but it means if I'm right about this, that you have a hard time arguing this is structural as opposed to something else. I see my time is running. You take your time. So I would push back on the position that Roy resolved the structural error issue because as you know, after the Roy Ambon came out, the Supreme Court issued the Weaver decision. And the Weaver decision, although not, you know, on point with regard to the facts, very carefully goes through all the situations where structural error might exist. They said there are cases where if the error protects a right other than erroneous conviction, if the effects are too hard to measure, and if it always leads to fundamental unfairness. I think in the Roy case, this court only addressed whether the effects are too hard to measure. The problem there, though, is what you would have to say is that the subsequent Supreme Court opinion so fully gutted Roy as to leave nothing left. And I don't think you can say that. I would respectfully disagree that we have to show that it gutted Roy. I think it elucidated the issue of what constitutes structural error. And I think as we wrote in our reply brief, we need all three of Weaver's rationales. So we think that's an open issue for this court to consider. I think we definitely have a Brecht error here, which would again relieve us of the harmless error burden or defeat the government's burden to show that the error wasn't harmless. You know, Brecht quite clearly says that there may be a middle ground between trial errors and structural defects when there is a deliberate and egregious error. We have a stipulation that there was a deliberate error. The judge knew that he resumed the direct examination of the case agent without the defense being there. Help me with the purposes of my question. I want you to assume with me, just assume it, that this isn't structural. And I want you to assume with me that counsel for the defense really abandoned harmless error because they had two opportunities, one as clear as a bell, to interpose an objection to the court at a time in the course of the trial when he could have done something that might have made a read it back, go back and re-examine. There were a lot of prophylactic steps the district court could have taken and yet the question comes up, you're not going to state an objection at this point. It's odd. You read the transcript. That comes from Mr. Bonow, not from the court. As I read the transcript, Ms. Bonow, they really had the opportunity. So I want you just to assume with me that harmless error isn't appropriate here because they could have objected at a time that would have made a difference, arguably. Help me with plain error and most particularly help me with prong three. Prejudice prong on plain error review affecting the substantial rights. So I think prong three is the only thing that would be an issue in this case under the Olano test and we would reiterate that for prong three either structural or hybrid error satisfies prong three and you don't have to do a fact intensive. But I'm asking you to do that because for the purposes of my question, I'm asking you to assume that we reject a structural error application here and you've abandoned harmless error because you didn't object and clearly could have. So help me with plain error. The burden is yours. Help me see how you might have met it. So Olano says that we just have to show a reasonable probability of a different outcome, either an acquittal or a hung jury and we think we can show that due to the egregious nature of the district court's violation and Olano itself talks about how prong three can be satisfied with a presumption of prejudice. In Olano, I think the issue was the presence of alternate jurors during deliberation. The court goes through a lengthy analysis of why prejudice should not be presumed in that case. We say in Rodriguez, I remember it well, the third prong of the plain error test, however, is another matter. It requires that the error have, quote, affected substantial rights, which almost always requires that the error must have affected the outcome of the proceedings. The standard for showing that is the familiar reasonable probability of a different result formulation, which means a probability sufficient to undermine confidence in the outcome. We basically take the Strickland prejudice standard and glom it on to prong three of plain error. Tell me as a factual matter why you think you've met that. We think we meet it for two reasons. One, the message that the court sent to the jury by resuming the direct examination of the clear, the fact that the evidence elicited during that time established a number of propositions that Margarita's signature was on certain checks, she used certain accounts for personal expenditures, she controlled various bank accounts, and what we believe, the prejudice that's instilled in that I would respectfully request the court to consider this as an ex parte communication between the government and the jury, and not only of any witness, but the case agent, the case agent who had been sitting there during trial, who was called as a summary witness. As we all know, summary witnesses are called to the stand to marshal and bring all the evidence home to the jury, and the fact that these questions were not repeated once counsel or once Miss Garcia was present in court, I think we as we as established as both a factual and a legal matter, the third prong which is the only prong at issue under the plain error. Thanks very much. You have reserved your full rebuttal. Your Honor, I would say that this court should also consider the cumulative error doctrine combining the presence issues with the conceded jury instruction issues, and we think of the totality in Miss Garcia's conviction should be reversed. Thanks very much. It pleads the court, my name is Ann Schultz, I'm an assistant United States attorney, I represent the United States of America, the appealee in this matter. With me at counsel table is assistant United States attorney Jose Bonnell, who is the lead counsel at trial. Your Honor, the difference in Roy here, the ones that you pointed out, but I would start first with the plain error doctrine. As this court pointed out... So your view is we should review this through the prism of plain error? Correct, Your Honor. To do otherwise in this case, we are not disputing that mistakes were made, but the fact that the trial attorneys representing Mrs. Garcia had so many opportunities to remedy this, and they didn't. And as you pointed out, Judge Marcus, there were remedies available. Many could have been stricken the testimony, they could have instructed the jury, they could have had additional questions, and I think that it's important when, Your Honor, you were talking about that part of the both counsel and Mrs. Garcia were absent. The court at that time, it wasn't just that the defense attorneys were given the opportunity to object, but they didn't. But also, if you read that part, and I'm sure you already have, Judge Moore specifically invites that the defense counsel go forward, order the pages of the transcript, and come back and tell the court if there's anything in there that concerns her about prejudice, that the court welcomes the exploration of any concern about prejudice, before the government rests and goes to the Rule 29 argument. The prosecutor states, Your Honor, the government rests subject to the matters discussed at sidebar. Again, there were repeated opportunities, and instead of waiting until basically rolling the dice, the verdict comes back in, and at that point, raising the issues and asking a motion, filing a motion for new trial. To me, this is completely different from Roy in that sense, and plain error review should apply. The government would also submit that this is a situation where, contrary to the argument of counsel, the government strongly disagrees regarding the prejudice finding, or the prejudice in this case. You're right, Judge Marcus, this is different from Roy in the sense that there you had what I think Judge Jordan called a complete do-over. Every question was asked again. But here what you have is really the testimony that happened in that short period, and it was only three minutes when both were gone. I note because here we have a record. Well, in fairness, the defendant's gone more than three minutes. Correct, Your Honor, that's true. The defendant has a right to be present in his trial to confront his accusers, to turn to his lawyer and say, hey, that ain't so. Maybe you want him to defend it was gone between five and ten minutes or something like that, if I have it right. You have it completely right, and that's the period of time in looking at it. A critical difference here is even though the testimony wasn't repeated, the testimony at that point, all was basically publishing ten entries in a composite government exhibit. Let me ask you about that, and that's sort of what troubles me. For the first time during the absence of counsel and the defendant, the prosecutor elicits from the final witness, the summary witness who's there to tie the case together, ten individual particular, obviously personal expenditures. Two of them involve checks paid to an Eldorado furniture store, obviously having nothing to do with the medical business. One involves a payment to Sally Landrone for $9,500, who is Garcia's niece. One is a payment to Macy's, we don't know what for, but certainly had nothing to do with the business. One paid off the mortgage for a month. One involved a $56,000 payment to Williamson Cadillac for the purchase of a Hummer, and there were a number of checks made payable to cash or to her husband. When I looked at the record and I looked at the examination that preceded this, that is to say in the presence of counsel and the defendant, none of that had been elicited by check and by particularity. Rather, what you had was a statement of, here's exhibit six, I prepared it, it's got hundreds of entries in it showing personal expenditures. But the point isn't punched home until the prosecutor asks the summary witness, okay, let's take a look at these in particular. Tell me about exhibit one. It's a check made payable to $832. When? 6-18-07. What was that about? And it went through all 10 in that way. It seemed to me to crystallize the nature of the personal expenditures that formed the core of the charge that those tax returns were false. If the defendant and the lawyer aren't there, then the defendant gets up to cross-examine. He's not even aware of what came out in the course of that six-page interlude. In a sense, he's shooting blanks in the night, or she is. Surely she should have objected, and maybe there's a serious claim of ineffectiveness here, but that wasn't raised by counsel for the defense. But wasn't this a big deal? Wasn't this testimony really significant? And is it an answer just to say, well, it was embedded within hundreds of pages of documents, but it wasn't flagged, it wasn't highlighted, and it wasn't punched home until the summary witness says, boom, boom, boom, look at these checks. That's the problem that I'm having. Why doesn't that establish prejudice under prong three, a reasonable probability, a probability sufficient to undermine confidence? What am I missing? The following things, Your Honor. First of all, as far as the 2007 entries that you referred to in terms of the Macy's payment, the two Eldorado furniture payments, and there was also one that you didn't mention, the Victory Racing Enterprises. What's that, by the way? What is Victory Racing Engines? I couldn't tell from the record. I don't know, Your Honor. It appears to be some sort of racing, and that actually goes to my point. Those are debit cards. They're not checks. They're debit card transactions. It was made very clear at the time when everybody was there that the debit cards couldn't be used. This was information controlled or money controlled by the defendant, and that term was used. But prior to the existence of the... So seven of the ten are checks. Are the other three all debits? The two payments to Eldorado... Those are debits. I'm sorry. So those are checks to Eldorado. Eldorado, Macy's, and the Victory Racing Engines, those are debit cards. They're not attributed to anyone in particular. So you have those, and those are for 2007, because I think it's also important when you're talking about prejudice, Your Honor, to note that this is 2007 for seven of the transactions. The last three are 2006. The other thing is that, if I could backtrack for a moment, because I think this is very important, when you talk about the fact that it's the core part, before that chart went in, before they were absent, Arevalo, who was a summary witness, Mr. Caruso accidentally misspoke. She wasn't the case agent. She was a summary witness. And her main role, in addition to summarizing the evidence, was to say, how are the taxes due and owing? And we would have, I think, a different problem if we were talking about tax returns for 2001 to 2005, because Agent Arevalo testified that she determined the amount of income and taxes owed using personal expenditures. But that's not what happened in 2006 and 2007. She testified that those tax liabilities and the amount of income came from insurance payments and patient payments, only that. The disposition of assets had nothing to do with it. I look at it kind of like belts and suspenders, Your Honor. The way that Agent Arevalo determined the amount of income... Wasn't it the position, for example, of the United States that these 10 items all went to the returns for 2006 and 2007? Wasn't it the theory of the United States that the tax returns that were submitted for the years 2006 and 2007 were false and fraudulent because they grossly understated income? And among the things that they should have included and did not were some of these payments. Wasn't that the theory? That's true, Your Honor. But I think you also have to put it in context. First of all, for example, the mortgage payment. That was a recurring expense. And it was discussed extensively in terms of the 2005 because it came up before. I think it was, but 2005 wasn't a charged offense with respect to a false return. You could say maybe it was a predicate for the conspiracy, but it certainly wasn't foundation for material falsehood in the returns for 2006 and 2007, right? No, but Your Honor, I think it matters in this sense. When you're talking about... I think it's significant to know how prepared these lawyers were. And this was the summary witness. These charts were crystallizations or refinements of charts that had been prepared by the case agent, Agent McNeil. For instance, you were talking about the Macy's debit expenditure, the one of the Eldorado ones, and also the racing one, the victory racing engine. Those all were put in before the exhibit ever went in through Erivalo. They went in as a defense exhibit. Was there any reference in the testimony of the summary witness in the presence of the prosecutor's thoughts to elicit from the summary witness any of these 10 payments? No, not specifically, Your Honor. What happened was it was admitted... Was it a more general and abstract statement of, look at all these expenditures. They're all embodied in these summaries like exhibit six. That would be a fair statement, wouldn't it? Yes, Your Honor. Again, I think it's really important to remember that this came in as a secondary way to show income. It was not the way, the primary way, it was not the way the income was determined for 2006 and 2007. For those two years, you're talking about insurance and payment, and the numbers aren't close, Judge. For 2006, the insurance payments show almost $2 million coming in, and you've got a tax return for 2006 for Garcia and her husband, and Garcia was the primary wage earner or position earning money at Global in 2006 and 2007. They reported less than $20,000 in income. Let me ask you a question about this. Why do you suppose the government calls the summary witness at the end, this is the 23rd and last witness before the government rests, and more that's it. That's the end of the case. Presumably, you want to put on the most powerful or the most crystallizing piece of evidence at the end. Why do they save this for the end? I don't think, Your Honor, my reading of it is not a strategic, this is the most important. This is a tax case. I sure would have done it that way if I were trying the case for the government. I would want to highlight the personal nature of these expenditures in a way that was sort of concrete and immediate. She got a Hummer, she paid $56,000 for it, they debited expenses for Macy's, Eldorado Furniture, her mortgage, etc. Doesn't it make it like really vivid and concrete in a way that the documents in general don't? Maybe I'm missing this. It's perhaps a different perspective. That, Your Honor, is not at all how I read it, and I think part of that is having gone through this entire record. Global was the sole source of income. The Garcia family, incredibly tight-knit family, all the money was used for everyone together. As far as the Hummer, there was testimony from IRS Officer Reed who saw two Hummers there in 2007. Garcia was directly linked to a Hummer by a person. But simply to say that Garcia drove a Hummer doesn't establish a material fault on a tax return. On the other hand, if you can show that she took money passed through a corporation and bought a Hummer for $56,000, well, that's income, unless you can otherwise establish that it was a business deduction, which is a very difficult proposition to sustain. Doesn't that make it sort of concrete and immediate and tie it into the charge? Your Honor, I don't think so, and the other reason is that the defense attorney cross-examined Agent Arevalo about that Hummer. In the reply to the new trial motion, which was carefully phrased, she noted that those questions were all planned out before Agent Arevalo ever testified. I think that's a critical point that can't really be overemphasized, is how prepared Counsel and Garcia were. When you look at it, three of the defense exhibits, DXAA, BB, and CC, all were duplicates of those charts that went in. Again, defense counsel had the opportunity to find out and see exactly what was asked. Your Honor, on this record, it's clear in the government's view that she didn't order it because she didn't need it. They were checking off, check by check, as far as that they knew. They went line by line. They knew the original exhibits and charts by the case agent, Agent Arevalo, and they basically just lowered the numbers in a more careful, refined way. But the ones that went in, they were duplicates. They knew. They knew before that lunch break because the prosecutor said, we're just going to go over a few of them. Of course, Ms. Schultz, we would not have to engage in this extensive analysis if we had read Chronic differently and Roy, if we had determined that the absence of counsel during the inculpatory evidence by the government is a structural error and not a trial error, right? Well, Your Honor, I'll say two things on that. If I may, I'm over my time, but if I could take your time. First of all, obviously Roy is precedent, but beyond that, you do not have in this absence, and because you're talking about Chronic, I'm going to go back to the three minutes, which is four minutes less than you had in Roy. You don't have the pervasive, through the trials, shifting of the framework of the trial itself. I'm in no way just welcoming them. Let me put both. This was a 10-day trial? Correct, Your Honor. And counsel was absent for, what, maybe five minutes at the most? Three minutes. Three minutes. What if counsel was absent for the entire ninth day of a 10-day trial? Your Honor, when you're talking about... We would examine the evidence days one through eight and day ten, and if it was sufficient to convict Mrs. Garcia, we would apply harmless error review, right? Well, Your Honor, I will say this. In this case, it's plain error, and I disagree with the Supreme Court. What if we applied plain error review and there was no objection? Judge, I'm not going to be here for the ninth day of trial. You'll have to proceed in my absence. Your Honor, I think it's a completely different thing if you are talking about counsel being gone for a stage, or as I read the plurality opinion in Roy, a substantial portion. That's not this case. Well, where do we draw the line? Your Honor, you drew it in Roy at least to a degree. Here, you have... That's why I think it's a structural error, not a trial error, but that's besides the point now. But my next question is, I mean, this is the same judge who's conducting trials in the absence. What kind of message are we sending? What kind of message are we sending the district court in this case and in Roy when we permit a trial judge to conduct the trial in the United States District Court without counsel present and we're affirming those decisions? What kind of message are we sending the district courts when they do that? Your Honor, as I think was clear with Roy, I would say that this isn't going to happen again. Oh, if we affirmed him in Roy, if we affirm in this case, we're telling him it's all right to conduct trials without the defendant's counsel present as long as the evidence that's admitted when counsel is present is sufficient to convict them. Isn't that the message that we're sending? No, Your Honor, and if I could, two things on that regard. The United States agrees that there were serious errors here and we do not minimize it at all. When Mr. Caruso said that we agree it was a deliberate error by the district court, let me say this. I think that Judge Moore puts a premium or in the past has put a premium on his court schedule that was incorrect and unwarranted. There are other ways to take care of that. Absolutely. I will also say this, and if I may, I'm not completely within the record, but having been an AUSA in this district for almost thirty-three years, I don't look at this as a judge deliberately depriving the defendant of her rights. I think you have a judge who mistakenly had his priority on his schedule. If you look at his order denying the new trial motion, his findings were such that in his view, I think he thought the system should work in the sense that counsel wasn't there. If counsel had a problem, counsel would object. Judge Wilson, I'd also say even looking at the split opinions in particular with Judge Shoflat's concurrence saying, hey, the system worked, you also have to have the defense attorney doing their part. Again, I'm not condoning it, but I think that saying that Judge Moore or any other district court judge is after the Roy decision, and I mean after Roy, I mean Garcia, I think it's important to remember with state pending Troy, that Roy, this all happened before Roy, that you would not have this happen again. I think that the judge misunderstood the balancing, and so as far as the message, no, Your Honor. I think that if you send the message, in fact, I think if you would not and send it here, then you've got the opposite problem. You know, again... But you would have to concede that if we come away with a sufficient doubt about the jury verdict in this case, if our confidence is undermined, we've got to reverse. Isn't that right? Yes. If you look at the record and applying the plain air standard and for cumulative air, the... I'm not even talking about the other issues. I'm simply talking about proceeding with the trial in the absence of counsel and the absence of a defendant for the last witness of the United States at a point by any definition that's really important. Yes, Your Honor. I absolutely agree. Let me ask you a slightly different question. The charges here, there's a conspiracy count and count one, and there are three substantive false filing counts, one for year 97, one for 06, and one for 07. The ten questions, the offending questions in the absence of counsel all went to the years 06 and 07, right? Yes. Did they bear on 97 in any way? No, thank you for bringing that up, Your Honor. They didn't. On the other hand, though, the 97 return was one of the pivots, one of the objects of the conspiracy charge, so it's not as if count two is unrelated to count one. No, but I think it makes a difference in this sense. Do you follow what I'm suggesting? Yes, I do. This is why I still think that 1997 is completely separate. I think it's They were strictly in terms of global. And in the evidence going in, that there was money made by global and money spent by global. So the difference with the 1997 is when you look at the exhibits put in, which are the USBC, the US Bankruptcy Court ones, they were the numbers, the tax liability all came from the documents filed by Mrs. Garcia and her husband in bankruptcy court. And what you have there, so you have their filings made under oath. I think particularly important if you look at its government exhibit 12, USBC, it's the transcript of the creditor's meeting in bankruptcy court. And what you have is all sorts of questions being asked to Mrs. Garcia, or just generally to the Garcias, and Mrs. Garcia answers. So you have, when you look at the testimony of the bankruptcy attorney, you look at the filings that they put with the income. And taking a conservative approach, Agent Arevalo didn't even use the full amount of money in their filings that they said under oath was earned by them in 1997, before global ever even existed. So in that sense, I think your honor, you have overwhelming evidence as to 1997, not tainted. I understand what your honor is saying. I'm just asking for you to help me understand this case. Yes, and your honor, that is my view. That 1997, even though you are talking about the substantive false statement, or false filing under 72061 as the other substantive, and it is in the conspiracy, I still think under this record that it's clean. Let me ask you one final question that we've gone over, but give me your thoughts on this one. We can't use structural error here because that issue was resolved in Bonn, with a period of time that was even longer than the period of absent here, although in both instances, they're a very small piece, less than one half of 1% of the entire trial, they're absent. That we ought to fashion the footnote found in Brecht to create a hybrid exception. Do you want to comment about that? Yes, I strongly disagree with that. First of all, this court obviously has never extended, few courts have ever taken that footnote and extended it. The case that Mrs. Garcia cited from the 5th circuit is so distinguishable. I mean, that's the case that after Hurricane Katrina, you had the police officers who were on trial and you had the court found numerous high-level members of the U.S. Attorney's Office logging online. I think the key point about that, Your Honor, is again, you had it being pervasive throughout the entire trial, and more importantly, that you couldn't quantify the harm. And here, the fact that you have a district court judge who made a serious mistake by going forward without counsel and her attorney present. But I don't think in looking at the Brecht error, Your Honor, you can divorce the fact of the attorneys having the opportunity to cure it. And I think that it would be especially unwarranted to take the unprecedented step of applying Brecht error in this case, where the district court made a mistake, but he also, when it came up at the sidebar, while Arivalo was still on the stand and he allowed not only the attorney present, but the district attorney present, to come forward and recross on her. They could have recalled her. They could have instructed. To apply Brecht error here, I think it's unwarranted and should not occur. Thank you. Your Honor, if I could, I'm sorry. I think my colleagues have some questions as well. In one correction, and I'm sorry, I think it's because of a lack of clarity on my brief. The government doesn't concede the first two prongs of the plain error test as to all the jury instructions, but I apologize if that was unclear. No, but I read you certainly do concede that there was error on the Fifth and Sixth Amendment. Yes. That you conceded that the error was plain and obvious, and you conceded that the judge had erroneously concluded that the defendant had voluntarily absented herself from the trial, that he couldn't draw that conclusion without giving them a hearing. Your Honor, I'm not backtracking. Okay, I just want to, you're just talking about the other issues going to the instructions. Right. It's just when I, preparing for argument, realized that in particular as to the multiple objects, when the counsel says I didn't dispute something, that was not meant as a concession. That's all I meant, Judge. I think my colleague has some questions for me. Judge Graham. Help me with this. I understand that the testimony of the agent during the period of absence, the few minutes in question, had to do with a summary exhibit. I believe that there had been a stipulation regarding the admissibility of that exhibit. Am I correct? It went in without objection. Correct, Your Honor. All right. Well, had there been a stipulation? When did that stipulation occur? Did it occur before the agent was giving this testimony? Can you tell me that? Your Honor, well, let me correct what I just said on a stipulation. It went in without objection. Three of the schedules had been previously admitted as defense exhibits. They were identical to the ones that went in when Special Agent McNeil was in. So stipulation in the sense that there was a formal stipulation, no, but they went in without objection. All right. Thank you. Well, one follow-up question. Yes, sir. During the time of the absence of the defendant in counsel, did the agent say anything other than what was already contained in the exhibit, which was admitted without objection? Your Honor, yes. As I noted in my brief, there were three guesses. The first one is there was a misstatement by the prosecutor in referring to the Macy's and the Victory Racing Engines. And it's instead of saying that those debits were from account 3113, he said they were from account 3098. It's an immaterial difference because what mattered was that they were of the five accounts not given to Velati. That was discussed throughout the trial. It was there. But it's a difference but not a material one. The second one, Your Honor, was regarding the Hummer. And on that one, if you look at the exhibit, it shows the 56 plus thousand. It shows in the memo that it was for a Hummer. But the additional fact that was testified to that's not in the chart was that was the full purchase price of the Hummer. Again, in the government's view, that's not a material difference because it's the amount of money, it's for a Hummer, whether it was the full price or not, immaterial. Third one's more difficult. On the third one, if you look at it, it's a check and it's in for the 2006 account. The chart shows that there was a check and it shows it made payable to Angel Garcia, signed by Angel Garcia, endorsed by Angel Garcia, $45,000. But what Agent Arabalo testified at trial was that even though it said Angel Garcia, based on her review of the signatures, it had actually been signed and endorsed by the defendant, Mrs. Garcia. The reason the government has argued that that still is not a difference that results in prejudice to the defendant are the following. First of all, the testimony at trial regarding the signatures was extensive. Agent Arabalo and Agent McNeil repeatedly talked about the fact that the L, the G, and the CIA in Garcia is distinctive. But I take it there was no discussion other than in the absence of counsel and the defendant of that particular check, 5301, payable to Angel Garcia in the amount of $45,000. No, there's not. This is the only time the government's summary witness offers a personal lay opinion about the signature and offers the opinion that notwithstanding it saying Angel Garcia, in his opinion, this was really signed by the defendant, Lourdes Garcia, right? Yes, Your Honor. I can't find any place else in the transcript where that specific $45,000 check is discussed. And isn't there something else here? He also offers opinion testimony that the mortgage payment was personal income rather than something else. It may have been obvious, but he offers that opinion, doesn't he? Right. But the reason I don't consider that as something that's not in the chart, because if you look at the very top part of, that's the first chart in Exhibit 6, Miscellaneous, it says at the top, personal expenditures. And you also had Agent Arabalo. So that, to me, is not a gap. It's in the document. It was in evidence. I understand Your Honor's point that it hadn't been specifically referenced in that. But the fact that it says... Does the document say this is personal income to the defendant for this particular year? It says that it's a personal expenditures. Again, and Agent Arabalo, when everybody was there, testified that this was a secondary way to show income. Again, the way, the primary way and the way that the tax liability was determined was not based on the disposition of proceeds and personal income. It was based on insurance payments, and it was based on the fact of patient payments. And for 2006, again, you're talking about almost $2 million. So I don't mean to minimize the... You're just saying it's a small piece in a big pie. There's one other thing I'd like to note is that Mrs. Garcia admitted that she would sometimes sign her husband's signature. The defense was that she was a typical Latin wife, and I say that because that was the phrase used at trial. That her husband told her what to sign, and she would sign things without looking at them, without reading. She admitted signing his signature. If you look at Agent Arabalo's testimony, she says it appears to be the defendant's signature. We note, and if you look at the government's brief, referring to if you compare that check and the handwriting to checks that Mrs. Garcia admitted, there'd be her handwriting. There's no way to distinguish it. If the defense had been there and objected, it was proper lay opinion testimony, and I note they did not object one time when Agent Arabalo and Agent McNeil did the lay opinion testimony. The only time... Yeah, I'm sorry. I just wanted to say, to make sure, to be candid and clear with the court. On the second day of trial, there was an objection lodged when Mrs. Guerrero's daughter, who Angel Garcia signatures, and there was a question asked of her, is don't they look different? There was an objection that was overruled. To me, that's different in the sense that when you compare it with the undisputed or the lay opinion testimony, that was never objected to, but I wanted to bring it to the court's attention and not mislead it. Thank you very much. Mr. Caruso. Thank you. Ms. Schultz said that the summary witness was belt and suspenders. I would put it a different way, and this is to follow up on your questions, Judge Marcus. This was putting a bow on their case. The portion where Ms. Garcia and her counsel were not present was the driving home of the factors we discussed in my initial argument, that there were many checks made for personal expenditures. She used those accounts. She controlled those accounts, and she signed checks in her husband's name. As any trial lawyer knows, you want to end on a high note, and I think that's what happened here. They had a summary witness bring the evidence home. Yes. What's interesting about the point is, if you look at the closing argument, he barely makes reference to it. Right. Because of the summary witness, you often don't have to drive those points home during closing, because that's the purpose of the summary witness, to put that bow on the evidence for the jury, and in the limited time allotted to counsel for closing, you don't necessarily have to go through those line by line. Let me ask you this question. The testimony that went forward on these six pages in the defendant's absence, and in much of the lawyer's absence, all related to taxable years 06 and 07, and tax returns 06 and 07, which were, of course, part of the object of the conspiracy in count one, but they had no bearing at all on the second count, which was a false filing for the year 97. Even if you were right that it was plain error and substantially affected the jury as to 06 and 07, and maybe even as to the conspiracy, because that was part of the object of the count two. Well, the particular evidence that came in during their absence, I agree, does not bear on that particular count. But I don't think the court can segregate or cabin the evidence that came in during that time, count by count. I also agree that the evidence impacted the conspiracy count, especially when you look at all the jury instructions with the conspiracy. But the reason why that you sort of can't cabin the analysis in this way is for a reason Judge Wilson pointed out during Ms. Schultz's argument, that it sends the wrong message that a judge violates a person's Fifth and Sixth Amendment rights. And then the court looks to exactly the evidence that came in during the absence to decide what counts can stand and what counts can fall, because that sends the wrong message. The message that we should be sending to the district court, and I disagree with Ms. Schultz, that this was a mistake in balancing. The judge applied an ironclad rule. Trial starts when I'm ready, regardless of whether the defendant... Roy, of course, was decided after this case, right? Roy was, Roy was, the Roy panel was decided after this case. My understanding is that the Roy panel, the Roy argument had taken place and there was supplemental briefing that... I know I just meant that the opinion we put out in Bonk postdated the district court... Right, right. But I don't think there can be any argument that a district court judge sworn to uphold the Constitution doesn't realize he shouldn't start trial without the accused and the lawyer being there. I mean, the analysis that this court would engage in to determine whether that was reversible error, certainly that came out of the Roy panel and the Roy on Bonk, but the district court did not make a mistake in balance. Let me ask you just this final question, at least for me. One of the arguments you made earlier was that we ought to be applying harmless error, if not structural error. You concede structural error was essentially decided in Roy, but as to harmless error, the law is clear, is it not, that a party may preserve a claim of error by informing the court when the court makes a ruling or proceeds in a certain way, if the party wishes the court to take some action or to interpose an objection, certainly the rule of criminal procedure is clear. And the Supreme Court of the United States says in the classic plain error case, no procedural principle is more familiar to this court than that a constitutional right or right of any sort may be forfeited in a criminal case, just like in a civil case, by the failure to make a timely assertion of the right before a tribunal having jurisdiction to determine it. And they explain, and we've said it repeatedly, that the reason for it is just a very practical one, and the reason is you can't roll the dice and wait until you get a verdict you don't like. When you could have objected and if you had timely objected, the district court might have been able to correct the problem or the error. In this case, there were a lot of things the district court could have done if the defendant asked for it to be done. He could have read it back, he could have stricken it, he could have done a do-over with the witness, both on direct and cross, but in the absence of raising any objection when they could have raised an objection, how do we look at this for harmless error as opposed to plain error? That's really my question. So I think Wood v. Georgia covers that situation, Your Honor, where the defense counsel's conduct may have been implicated in the issue. And here we have an officer of the court who was herself late to court and she might have been read. It wasn't the lateness to court that was the offending problem. Once the lawyer comes to court, she could have blown the whistle, either when she walked in and there was cross, or when the prosecutor honorably and candidly said, Judge, we got an issue here. Maybe you want to read it back. Her failure to walk in on time in no way prevented her from flagging the issue for the judge when she came in on Friday or when the prosecutor raised the issue on Monday morning. So I don't understand how her failure to show up on time stopped her from objecting when she had every opportunity both on Friday afternoon and on Monday morning and was asked point blank, do you object? And she says, no, not at this time. Am I missing something here? I wouldn't say you're missing anything, Judge Marcus. I would like to amplify. Please. So I don't think it's, I think it's fair to say her lateness did not prevent or stop her from raising an objection. What I'm saying is that her lateness caused the issue of her absence, and she might be reticent to raise that issue with the judge because it implicated her own conduct. So it's a reticence, not a prevention or a stoppage, which is one of the Wood v. Georgia factors. And I think the other two factors apply as well, that the government knew of the issue and the judge knew of the issue. With regard to what happened at Sidebar the following trial day, I think we have to look at that exchange in context. The issue was noted for the judge. The judge expressed no surprise that this was an issue. He knew that this is what happened. The prosecutor, an honorable prosecutor, I will agree with that, asked for a readback of the testimony. The judge said no. So at that point, my reading of the transcript is that Ms. Garcia's defense counsel, and by the way, this is Sidebar, and Ms. Garcia is not present, which is also a violation of Rule 43, that the Defense Lawyer Act, we asked in the ruling that the transcript was not going to be read back. And I think as defense counsel, if the judge has already said those pages are not going to be read back... Right. The problem with the argument, at least for me, that argument is that if you look at the his comment, you know, Mr. Bonnell says to the extent that there was any evidence presented that could have been incriminating to the defendant, and make no mistake, there was. That's me, not Bonnell. We want to make sure that they have an opportunity to consider it and state their position before the government arrests its case. The court, and they are welcome to do that. I mean, I took it as she voluntarily absented herself from the proceedings. That's one way to look at it. Just out of an abundance of caution, Judge Moore says, if she thinks there's any kind of prejudice, she can order the transcript. If she thinks there's some issue there, she's welcome to explore it. Ms. Pugliese, okay judge, doesn't end even there. Bonnell, you're not going to state an objection at this point, talking to Pugliese. Pugliese says, no, not at this time, no. I mean, that's the colloquy. I'm not here to argue that defense counsel acts appropriately, your honor. I have little doubt that if we were to affirm the conviction here, and cert was denied, it wouldn't take a New York second before a 2255 petition was filed claiming ineffectiveness of counsel, and they've already conceded performance violation. So all you'd have is we'd be right back with the question of prejudice. Exactly, but it's a more difficult prejudice standard on habeas than we have here. All I'm saying, your honor, is that given the context and Chief Judge Moore's ruling that he wasn't even going to read it back, I think in defense counsel's mind, made it futile to ask for a mistrial, a striking of the witness, or a do-over. Yes, he offered to her that she could order the transcript, but that's hardly a remedy for the powerful and negative message that the judge sent to the jury when he resumed the trial to an empty defense testimony. I understand. Well, a do-over could potentially be even more prejudicial, because you've got inculpatory evidence coming in, and the jury hears it twice, which enhances the evidence, and the defense counsel didn't have the opportunity to see the reaction of the jury to the evidence the first time around, which might factor into the way that he cross-examines the witness. That's exactly right, Judge Wilson. The summary witness was on, defense counsel knew that inculpatory evidence was coming in. She knew she missed a portion. Why, if it's either putting a bow on it or belt and suspenders, a defense lawyer would never want the jury to hear that twice. I would like to finish up with that we do believe that there is Brecht error here, and the court should find that. It would not be unprecedented. The case we cited in our brief, Bowen, yes, is different factually, but it stands for the proposition that between a structural defect and a trial error, there are errors that happen in between, and the standard that the Supreme Court set out in Brecht footnote 9 is deliberate and egregious, and we think we have both. The Bowen case actually cites a Harbin case from the Seventh Circuit, which holds the same thing, and importantly, it doesn't involve prosecutorial misconduct. It involves the district court judge giving the government the use of a peremptory challenge in the middle of trial. So we think there are a number of ways you can reverse Ms. Garcia's conviction, either plain error, harmless error, structural or hybrid error or cumulative error, and we look forward to do so. Thank you. I thank the parties for well and vigorously arguing the case. We've gone way over, but you've helped us with the questions we have, and I wanted to take a moment to thank the United States for its candor in its briefing and for Mr. Bonow having to flag, actually flagging the issue for the district court. We appreciate your efforts. We'll move on to the next case.